PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
David W. Reid, Bar No. 267382
dreid@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA  92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL KEARNEY,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>DD KARMA LLC, a Delaware entity, d/b/a WWW.DERMAFLASH.COM,<br><br>　　　　Defendant. | Case No.:  3:25-cv-02069-JO-MSB<br><br>**FIRST AMENDED COMPLAINT** |

Plaintiff Daniel Kearney ("Plaintiff") alleges as follows:

## I.　　NATURE OF ACTION

1.　　This First Amended Complaint concerns an egregious privacy violation and total breach of consumer trust in violation of California law.  When consumers visit the commercial website of https://www.dermaflash.com (the "Website"), which is owned and operated by Defendant DD Karma LLC ("Defendant"), Defendant displays to them a pop-up cookie consent banner known as a consent management platform ("CMP") on the homepage.  Defendant's cookie banner discloses that the Website uses cookies, but expressly gives users the option to control how they are tracked and how their personal data is used.  Defendant assures visitors that they can choose to accept *only* "Strictly Necessary Cookies" by declining to allow the "Sale of Personal Data" via

- 1 -

a toggle switch and clicking a button stating "Confirm My Choices" as depicted in the following screenshot:



2.      Like many internet websites, Defendant designed the Website to include resources and programming scripts from third parties that enable those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data.  Unlike other websites, however, Defendant's Website offers consumers a choice to browse without being tracked, followed, and targeted by third party data brokers and advertisers.  Defendant's promises, however, are false.  Defendant's promises are designed to lull users into a false sense of security. Even after users elect to accept only "Strictly Necessary Cookies" cookies and to reject the "Sale of Personal Data," Defendant surreptitiously enables several third parties – including registered data brokers, Tapad, LiveIntent, and MediaWallah, as well as other entities known as TikTok, Snapchat, Microsoft Ads, and AddShoppers (collectively, the "Third Parties") – to track users' website browsing activities and eavesdrop on users'

FIRST AMENDED COMPLAINT

private communications on the Website via either pixels or third-party cookies stored on user devices from which they transmit information to third party servers.

3. Contrary to users' express rejection of cookies and tracking technologies on the Website, Defendant, nonetheless, caused cookies, including the Third Parties' cookies, to be sent to Plaintiff and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. Plaintiff is informed and believes and thereon alleges that these third-party cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

4. The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain including creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

5. This type of tracking and data sharing is exactly what the Website visitors who selected only to allow the "Strictly Necessary Cookies" by using the toggle switch in the CMP to reject the "Sale of Personal Data" on the Website's CMP made available via the Website's cookie consent banner sought to avoid. Defendant falsely told Website users that it respected their privacy and that they could avoid tracking and data sharing when they browsed the Website. Despite receiving notice of consumers' express declination of consent, Defendant defied it and violated state statutes, and tort duties.

- 3 -

## II.    THE PARTIES

6.    Plaintiff is, and was at all relevant times, an individual and resident of the State of California.  Plaintiff is and was at all times mentioned herein a citizen of the State of California.  Plaintiff intends to remain in California and makes his permanent home there.

7.    Defendant is a limited liability company organized under the laws of the State of Delaware.  Plaintiff is informed and believes and thereon alleges that Defendant is based in Illinois.  Defendant is a skincare products online retailer.

## III.    JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 because it has original federal question jurisdiction.

9.    Defendant is subject to jurisdiction under California's "long-arm" statute because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States."

10.    Defendant is an online retailer that owns and/or operates the Website, which markets, advertises, and sells products and/or services nationwide and in California.  Defendant has substantial contacts with and receives substantial benefits and income from and through the state of California.  Defendant made, and continues to make, offers to consumers in California.

11.    Defendant engaged in intentional acts by operating its Website and making it available to California residents, advertising its skincare products via its Website to California residents including Plaintiff, expressly aiming its conduct toward California residents by conducting substantial business with residents of the State of California via its Website, and causing both intangible injuries and economic harm to California residents that Defendant knew would be likely to be suffered in California.

12.    Defendant sells products and/or services to California residents via the Website as part of its regular course of business.  Plaintiff is informed and believes and thereon alleges that Defendant sells thousands of products and/or services each year to

- 4 -

California residents via the Website. Plaintiff is informed and believes and thereon alleges that Defendant exercises at least some level of control over the ultimate distribution of its products sold via the Website including products shipped into California.

13. Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the acts and events giving rise to the claims occurred in this District.

## IV. FACTUAL ALLEGATIONS

## A. Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Trackers.

14. Every website including the Website is hosted by a server that sends and receives communications in the form of HTTP requests such as "GET" or "POST" requests to and from Internet users' browsers. For example, when a user clicks on a hyperlink on a Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website's server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address so that the Website server knows where to send the HTTP response.

15. An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

16. Defendant voluntarily integrated "third-party resources" from the Third Parties into the Website's programming. "Third-party resources" refer to tools, content

- 5 -

or services provided by third-parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

17. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

18. First-party cookies are those that are placed on the user's browser directly by the web server with which the user is knowingly communicating (in this case, the Website's servers). First-party cookies are used to track users when they repeatedly visit the same website.

19. A third-party cookie is set by a third-party domain/webserver (e.g., www.youtube.com; irxcm.com; clarity.ms, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

20. As described further below, the Website has embedded the software code of multiple data brokers registered with the California Privacy Protection Agency. According to the esteemed Brennan Center for Justice, data brokers are "the main

- 6 -

purveyors of surveillance capitalism" that "collect, assemble, and analyze personal information to create detailed profiles of individuals, which they then sell to "financial institutions and insurance firms….Advertising companies… predatory loan companies, stalkers, and scammers…foreign actors…and law enforcement and other government agencies including the FBI and the IRS."). *See* https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole (last visited Nov. 26, 2025). Plaintiff is informed and believes and thereon alleges that the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

- **Visit History**: Information about the frequency and total number of visits to the Website;

- **Website Interactions**: Data on which links, buttons, or ads on the Website that a user clicks;

- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website's content;

- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

FIRST AMENDED COMPLAINT

• **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

• **Referring URL**: Information about the Website that referred the user to the Website;

• **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Websites during that session;

• **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and

• **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

21. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to boost website performance and revenue through the collection, utilization, and dissemination of user data.

22. Defendant owns and operates the Website, which allows visitors to receive information about its products and/or services and to purchase skincare products. As they interact with the Website (e.g., by entering data into forms, clicking on links, and making selections), Website users communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data,

- 8 -

demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

23. Defendant chose to install or integrate the Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the software code of its Website, it has complete control over whether first-party and third-party cookies are placed on its users' devices and/or transmitted to third parties.

24. Defendant explained the third-party cookies it used on the Website as follows on the Dermaflash Privacy Policy last updated as of October 4, 2024 (the "Privacy Policy"):

> "We use cookies, beacons, pixels, tags and other tracking technologies *to serve you targeted advertising* and to perform analytics regarding use of the Websites. (**"Cookies and Other Tracking Technologies"**) We may use tracking technologies in connection with our Websites, which may include the collection and storage of information about your online activities over time and across third-party websites or online services."

(Privacy Policy last updated Oct. 4, 2024 § 7) (first emphasis added; second emphasis in original); https://dermaflash.com/pages/privacy-policy (last visited Nov. 26, 2025).

25. Defendant's Privacy Policy reiterated that "We and our third party partners use third-party cookies, to collect or receive information to serve you with targeted advertising." (Privacy Policy last updated Oct. 4, 2024 § 7.)

26. Defendant's Privacy Policy explained the Website's use of cookies as follows:

> "We use cookies and other tracking technologies, as defined in Section 7 below, in order to collect and store information concerning your use of the Websites.

- 9 -

This includes information such as which pages are most popular and remembering you and your preferences, your IP address, unique identifiers, device functionality (including browser, operating system, hardware, and mobile network information), device location, device characteristics, city, time zone, and referring URL.  This usage information may be stored or accessed using a variety of technologies that may be downloaded to your personal computer, browser, laptop, tablet, mobile phone or other device whenever you visit or interact with our Websites."

(Privacy Policy last updated Oct. 4, 2024 § 3.)

27.    Defendant's Privacy Policy last updated as of October 4, 2024 explained Defendant's use of targeted advertising in relevant part as follows:

"The Company collects and uses your Personal Information for the following reasons:

"To customize your experience on the Websites or to serve you specific content or ads that may be relevant to you[.]"

(Privacy Policy last updated Oct. 4, 2024 § 4.)

28.    Defendant's Privacy Policy last updated as of October 4, 2024 states that "We may share or disclose your Personal Information with others including" "Social media platforms, our business partners and other third party organizations to provide you with information about products, services and special offers we think may interest you."  (Privacy Policy last updated Oct. 4, 2024 § 5.)

**B.    Plaintiff's Investigation Has Detected Pixels, Cookies, and Spyware Operating through the Website.**

29.    Plaintiff's investigation of the Website has detected cookies, pixels, and spyware operating through the Website.

30.    Plaintiff's investigation of the Website has determined that visitor data is harvested and shared with third-party services immediately upon webpage loading,

- 10 -

preceding any opportunity for visitors to consent to or decline the Website's non-essential cookies in the CMP and Privacy Policy.

31. The browser's developer tools allows for the inspection of third-party cookies stored on a user's device by a website, which reveals the cookie's name, the domain that set it, its category or purpose, and the platform with which it is associated.

32. Third-party cookies can only be set by the third-party server itself, and not by the website directly. Thus, if a third-party cookie is present, it necessarily means that a tracking script from that third party was loaded and successfully executed on the website at issue.

33. Once the tracking script runs, it sends user data to the third party's server. In response, the server sets a cookie in the visitor's browser. This cookie allows the third party to recognize and track the user during future visits even across different websites.

34. Plaintiff's investigation of the Website has detected multiple third party code deployed on a user's browser without consent provided by the user immediately upon webpage loading as depicted in the screenshot below:

- 11 -

FIRST AMENDED COMPLAINT

35. The cookies shown above were deployed to the user's browser before the consent banner was acknowledged. These third-party identifiers were used for advertising, analytics, or tracking purposes and represent data collection occurring without prior authorization from the user.

### 1. **Tapad**

36. Tapad, Inc. ("Tapad") is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Nov. 26, 2025).

37. Tapad is an identity resolution service for building audiences for targeted marketing and advertising campaigns.

38. The Website's use of the Snapchat pixel causes the user's browser to send a request to the Tapad pixel (https://pixel.tapad.com/idsync/ex/push) to synchronize

- 12 -

user cookie data across both platforms. This allows Tapad to retrieve detailed records of user activity recorded by Snapchat.



39. The **TapAd_DID** and **TapAd_TS** cookies serve as unique identifiers that enables Tapad's cross-device identity resolution technology, connecting user actions across multiple devices to create unified user profiles for advertising purposes.

| Name | Value | Domain | P... | Expires / Max-... | S |
|---|---|---|---|---|---|
| TapAd_DID | b602bcff-9518-4c03-ac04-af... | .tapad.com | / | 2026-01-16T1... | |
| TapAd_TS | 1763408545843 | .tapad.com | / | 2026-01-16T1... | |

## 2.  **LiveIntent**

40. LiveIntent is a data broker registered with the California Privacy Protection Agency. *See* https://cppa.ca.gov/data_broker_registry/ (last visited Nov. 26, 2025).

41.  LiveIntent is an email marketing automation tool that identifies website visitors and uses behavioral tracking to create marketing audiences for their customers' targeted email marketing campaigns.

42.  Web beacons are sent to LiveIntent servers (liadm.com) to track visitor activity on the Website and collects a unique device ID.



43.  The LiveIntent Device ID cookie (lidid) is stored on the browser for 730 days and enables LiveIntent to identify and track user devices across other websites, building a unified behavior profile for users.

| Name | Value | Domain | P... | Expires / M... |
|---|---|---|---|---|
| _li_ss | CgA | i.liadm.com | /s | 30 days |
| lidid | 5d850ab1-888a-4590-a3e3-1984bf180... | liadm.com | / | 730 days |

FIRST AMENDED COMPLAINT

### 3.     **MediaWallah**

44.     Media Wallah Inc. ("MediaWallah") is a data broker registered with the California Privacy Protection Agency.  *See* https://cppa.ca.gov/data_broker_registry/ (last visited Nov. 26, 2025).

45.     MediaWallah is a company that focuses on data connectivity and identity resolution in the data ecosystem sector.

46.     After the cookie banner is rejected and the homepage refreshed, web beacons are sent to MediaWallah servers to track visitor activity on the Website. Tracking cookies are stored on the user's browser for 13 months.



| Name | Value | Domain | P... | Expires / Max-Age |
|------|-------|--------|------|-------------------|
| mCookie | b351acc0-c3fa-11f0-971c-5fb54... | .mediawallahscript.com | / | 2026-12-22T21:16:36.... |
| mUserCookie | %7B%7D | .mediawallahscript.com | / | 2026-12-22T21:16:36.... |

FIRST AMENDED COMPLAINT

**4.      TikTok**

47.      Web beacons are sent to TikTok servers to track visitor activity and enrich data using visitors IPv6 address. Additional data tracked includes the page URL viewed, device type, device IPv4 address, device user agent, event timestamp, page view unique ID, session unique ID, message event unique ID, user tracking IDs.



48.      The TikTok _ttp tracking cookie is used to collect data about users for the purposes of delivering targeted interest-based ads. Below is a screenshot of the first-party cookie stored on the browser.

| Name | Value | Domain | Path | Expires / Max-Age | Size |
|------|-------|--------|------|-------------------|------|
| _ttp | 01KA9NDY9MC65G7ZPB8MTXPJAH_... | .dermaflash.com | / | 2026-12-12T19:4... | |

FIRST AMENDED COMPLAINT

## 5. Snapchat

49. The Snap Pixel (Snapchat Ads Platform) is used to track visitor activity, device identity, and engagement for ad targeting and attribution across Snapchat's advertising network.

50. Observed data categories include:

- Identifiers: Unique visitor, session, and correlation IDs.
- Device Data: OS, browser type, architecture, screen dimensions.
- Network Data: Referrer URL, timestamps, pixel IDs, session timing.
- Behavioral Data: Page views, user interactions, focus/scroll activity.

51. The Website transmits behavioral and device-level identifiers to Snapchat's advertising endpoint. The payload contains multiple session tokens, unique visitor IDs, and fingerprinting attributes. The request establishes a persistent "sc_at" cookie, enabling cross-site user profiling and ad targeting by Snapchat Ads.



FIRST AMENDED COMPLAINT

52.  The third-party "**sc_at**" cookie is stored on the browser for 13 months and able to link browser activity across visits and domains to a persistent identifier.

| Name ▼ | Value | Domain | P... | Expires / Ma... | S |
|---|---|---|---|---|---|
| sc_at | v2\|H4sIAAAAAAAAAXBgRUAIAQFwlm8J... | .snapchat.com | / | 390 days | |

### 6.    Microsoft / Bing

53.  A request is sent to the Microsoft service Bing.com to behaviorally track visitors, reporting content they have viewed across their session on the Website. After the request is processed by Bing, the server assigns visitors a machine unique identification value that allows for enhanced visitor identification and tracking across multiple website sessions.



FIRST AMENDED COMPLAINT

54.    The **MUID cookie** is used for marketing/advertising and identifies unique web browsers to store and track visits across websites. The tracking cookie is stored on the visitor's browser for a year.

| Name | Value | Domain | Path | Expires / Max-Age | |
|------|-------|--------|------|-------------------|---|
| MR | 0 | .bat.bing.com | / | 2025-11-24T19:4... | |
| MUID | 13258D247DDD63B934D89B837C4... | .bing.com | / | 2026-12-12T19:4... | |

### 7.    **AddShoppers / SafeOpt**

55.    AddShoppers/SafeOpt is a robo-marketing platform for sending marketing emails to user's that "engage" with a company's website. The way it works is that if a user signed up for an email list for a site that uses SafeOpt, then other sites can send marketing emails once a user visits their site. The SafeOpt website states:

> "Our system allows for participating brands to contact you by email after you have engaged on their website without revealing your email to them"

> "Don't remember signing up through our website directly? Then you must have joined SafeOpt through one of our many publisher or brand partners' sites. We have a partner network with 2,000+ large brands and publishers. When people sign up for emails on a site in our partner network, they can join our network at the same time."

56.    Below is a request sent to SafeOpt/AdShoppers servers (shop.pe) to track visitor activity on the Website, stores tracking cookies, and sends cookie values in an attempt to identify visitors.



**C.    Defendant Falsely Informed Users that They Could Reject the Website's Use of Non-Essential Cookies.**

57.    When consumers in California visited the Website, the Website immediately displayed to them a pop-up cookie consent banner. The pop-up cookie consent banner stated, "This website uses cookies to enhance user experience and to analyze performance and traffic on our website. We also share information about your use of our site with our social media, advertising and analytics partners."

58.    The cookie consent banner purported to provide users the opportunity to reject non-essential cookies by including in such banner a hyperlink named "Do Not

Sell My Personal Information" as shown in the following screenshot, which is an excerpt from the Website:



59.    Website users who clicked or selected the "Do Not Sell My Personal Information" hyperlink, indicating their choice and/or agreement to decline or reject all non-essential cookies and tracking technologies in use on the Website, were then taken to the Website's CMP.

60.    After a user opts-out of non-essential cookies via the CMP, TikTok, Snapchat, and AddShoppers continue to track users on the Website.

61.    A screenshot image showing that TikTok and Snapchat continue to track users on the Website is depicted below:

FIRST AMENDED COMPLAINT

62.     A screenshot image showing that AddShoppers continues to track users on the Website is depicted below:



63.     After a user opts-out of non-essential cookies via the CMP, the pre-consent spyware constituting third party cookies no longer apparently fire on the Website. While the spyware constituting third party cookies no longer track users on the Website, the third party cookies that were loaded before consent are not removed from the browser storage. This means that the spyware platforms are still able to track and identify users across other websites that also use the same service.  Below is a screenshot of the tracking cookies still stored on the user's browser after all non-essential cookies have been rejected.

FIRST AMENDED COMPLAINT



64. Defendant's pop-up cookie consent banner and CMP led Plaintiff, and all those similarly situated users of the Website, to believe that they declined or rejected all non-essential cookies and tracking technologies, especially those that share personal information with third parties, such as performance, targeting, and social media cookies. The banner and CMP further reasonably led Plaintiff and other Website users to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the

- 23 -

toggle switch to de-activate "Sale of Personal Data" in the CMP.  Defendant's representations, however, were misleading.

65.    In truth, Defendant did not abide by its users' wishes.  Even though Defendant received notice that certain users, through their selection to de-activate the "Sale of Personal Data," did not consent to the placement or transmission of either first-party cookies or third-party cookies that would allow third parties to obtain their Private Communications with the Website, Defendant nonetheless caused the Third Party tracking cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data—*even for those users who elected to reject all non-essential cookies*.  As mentioned above, the spyware platforms are still able to track and identify users across other websites that also use the same services on the Website.

66.    Even when consumers like Plaintiff tried to protect their privacy by rejecting cookies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

**D.    The Private Communications Collected Are Valuable.**

67.    The Private Communications that the Third Parties (and other third parties) track and collect by way of the cookies on the Website is valuable to Defendant as well as the Third Parties (and other third parties).  Defendant can use the data to create and analyze the performance of marketing campaigns, website design, product placement, and target specific users or groups of users for advertisements. For instance, if Defendant wanted to market certain of its products to consumers, Defendant could use the data collected by the Third Parties to monitor users who visit webpages related to specific products, then advertise similar products to those particular users when they visit other webpages. The third-party cookies also enable Defendant to target online advertisements to users when they visit *other* websites, even those completely unrelated to Defendant and its products and services.

FIRST AMENDED COMPLAINT

68. Data about users' browsing history enables Defendant to spot patterns in users' behavior on the Website and their interests in, among other things, Defendant's products. On a broader scale, it enables Defendant to gain an understanding of trends happening across its brands and across the consumer electronics market. All of this helps Defendant further monetize its Website and maximize revenue by collecting and analyzing user data.

69. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[1] Indeed, "[t]he monetary value of personal data is large and still growing, and  corporate America is moving quickly to profit from the trend." *Id.* "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id.*

70. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell his data or the consumer's willingness to pay to protect his information.

71. Through its false representations and aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to track users' Private Communications on the Website using third-party cookies, Defendant is unjustly enriching itself at the cost of consumer privacy and choice, when the consumer could otherwise have the ability to choose if and how they would monetize their data.

**E.    Plaintiff's Experience**

72. In August 2025, Plaintiff visited the Website to browse information about the Website's products advertised on the Website.  Plaintiff was unaware of the secret spyware being used to surveil visitors and to monetize their personal information.

---

[1] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

- 25 -

FIRST AMENDED COMPLAINT

Plaintiff is both (1) genuinely interested in the goods, services, and information available on Defendant's Website, and (2) a consumer privacy advocate who works as a "tester" to ensure that companies abide by the privacy obligations imposed by California law.  The Ninth Circuit recently made exceptionally clear that it is "necessary and desirable for committed individuals to bring serial litigation" to enforce and advance consumer protection statutes, and that Courts must not make any impermissible credibility or standing inferences against them.  *Langer v. Kiser*, 57 F.4th 1085, 1095 (9th Cir. 2023).

73.    During Plaintiff's August 2025 visit, third party cookies began to collect information about Plaintiff's device and Plaintiff's interactions with the Website the moment that Plaintiff landed on the Website.

74.    When Plaintiff visited the Website on August 2025, the Website immediately presented him with Defendant's pop-up cookie consent banner.

75.    Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff selected the toggle switch declining to allow the "Sale of Personal Data" in the CMP. Plaintiff believed that selecting such option would allow him to opt out of, decline, and/or reject all non-essential cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of user data to third-party advertising networks, analytics services, and/or social media companies for the purposes of providing personalized content, advertising, and analytics services).

76.    In selecting the option to decline the "Sale of Personal Data" via the toggle switch in the CMP, Plaintiff gave Defendant notice that he did not consent to the use or placement of non-essential cookies and tracking technologies while browsing the Website. In reliance on these representations and promises, only when did Plaintiff continue browsing the Website.

77.    Even before the pop-up cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used

- 26 -

FIRST AMENDED COMPLAINT

for performance targeting, and social media functions, to be placed on Plaintiff's device and/or transmitted to the Third Parties along with user data, without Plaintiff's knowledge. Accordingly, the pop-up cookie consent banner's representation to Plaintiff that he could reject the use and/or placement of all non-essential cookies and tracking technologies while he browsed the Website was false. Contrary to what Defendant made Plaintiff believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

78.    Then, as Plaintiff continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner and CMP, and despite Plaintiff's clear rejection of the use and/or placement of such non-essential cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of non-essential cookies along with user data, including those involved in providing performance, targeting, and social media services, from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff's Private Communications as Plaintiff browsed the Website.

79.    Defendant's representations that consumers could reject the "Sale of Personal Data" while Plaintiff and users browsed the Website were either untrue or misleading.  Had Plaintiff known this fact, he would not have used the Website. Moreover, Plaintiff reviewed the pop-up cookie consent banner prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to reject all non-essential cookies, Plaintiff would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

80.    Plaintiff continues to desire to browse content featured on the Website. Plaintiff would like to browse websites that do not misrepresent that users can reject all cookies and tracking technologies. If the Website was programed to honor users' requests to reject non-essential cookies and tracking technologies, Plaintiff would likely

FIRST AMENDED COMPLAINT

browse the Website again in the future, but will not do so until then. Plaintiff regularly visits websites that feature content similar to that of the Website. Because Plaintiff does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to reject all non-essential cookies and tracking technologies, Plaintiff will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff is not a software developer and has not received training with respect to HTTP network calls.

81.     Thus, legal damages are inadequate to remedy the imminent threat of future harm that Plaintiff faces.  Only an injunction can remedy this threat of future harm.

## V.     **CLAIMS FOR RELIEF**
### **FIRST CLAIM FOR RELIEF**
**Federal Wiretap Act**
**(Violation of 18 U.S.C. § 2511)**

82.     Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

83.     The federal Wiretap Act creates criminal liability for "any person who … intentionally intercepts … any wire, oral, or electronic communication," or who "intentionally uses" such content "knowing or having reason to know that the information was obtained through" interception.  18 U.S.C. § 2511(1)(a) & (d).

84.     The third-party cookies or tracking pixels installed on the Website were used to intercept the contents of communications between Plaintiff and the Website in

real time, including HTTP requests, URLs visited, and other metadata exchanged as part of Plaintiff's interactions with the Website. These communications constitute "electronic communications" under 18 U.S.C. § 2510(12).

85. Defendant and/or its agents intentionally intercepted, or procured the interception of, these electronic communications using the cookies or tracking pixel technology, without Plaintiff's knowledge or consent.

86. The interception occurred contemporaneously with the transmission of the electronic communication, satisfying the "in transit" requirement under the Wiretap Act.

87. No exception under 18 U.S.C. § 2511(2)(d) applies because Plaintiff did not consent to the interception, and Defendant exceeded any purported authorization by misrepresenting the nature of the data collection and the identity of the third-party recipients.

88. Defendant acted with a tortious and unlawful purpose when it enabled and permitted a third-party data broker (or other third party) to intercept Plaintiff's electronic communications through the use of a tracking pixel embedded on Defendant website. Under 18 U.S.C. § 2511(2)(d), even if one party to a communication consents, the Wiretap Act is violated if the interception is made for the purpose of committing any criminal or tortious act. Courts have recognized that surreptitious data collection in violation of privacy rights can satisfy this "tortious purpose" standard. In *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 607 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1684 (2021), the Ninth Circuit held that Facebook's interception of browsing activity via tracking technologies could constitute a violation of the Wiretap Act where the conduct was undertaken for the purpose of violating users' privacy rights, such as by committing the tort of intrusion upon seclusion. Here, Defendant's facilitation of a third-party's interception—despite promising to protect user privacy— was done with the purpose of enabling commercial exploitation of user data in violation

FIRST AMENDED COMPLAINT

of California common law privacy rights, including intrusion upon seclusion. This renders the interception unlawful under § 2511(2)(d).

89. Defendant intended to disclose its Website visitors' personally identifiable communications to Third Parties (and other third parties) so that it could deliver targeted advertisements to its customers despite its promise not to collect or use Private Communications for users who declined to allow the "Sale of Personal Data" via the toggle switch in the CMP.

90. Defendant customized and deployed the third party code embedded on its Website, which allowed the transmission and storage of first party or third party cookies onto Plaintiff's device and browser, and, as a result, played an active role in the use of the code to intercept Plaintiff's electronic communications and knowingly and unlawfully used those intercepted communications to guide its advertising and marketing efforts.

91. As a result of this unlawful interception, Plaintiff is entitled to damages under 18 U.S.C. § 2520(c)(2)(A)-(B), including the greater of actual damages and any profits made by the violator as a result of the violation or statutory damages of the greater of $100 per day per violation or $10,000, punitive damages under 18 U.S.C. § 2520(b)(2), reasonable attorney's fees under 18 U.S.C. § 2520(b)(3), and equitable relief and declaratory relief under 18 U.S.C. § 2520(b)(1).

## SECOND CLAIM FOR RELIEF

### Intrusion Upon Seclusion

92. Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

93. To assert a claim for intrusion upon seclusion, Plaintiff must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiff had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

FIRST AMENDED COMPLAINT

94.    By permitting third-party cookies to be stored on consumers' devices, which enabled the Third Parties (and other third parties) to track and collect Plaintiff's Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the Website's pop-up cookie consent banner and CMP, Defendant intentionally intruded upon the solitude or seclusion of Website users.  Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

95.    The Third Parties' (and other third parties') tracking and collecting of Plaintiff's Private Communications on the Website using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties (and other third parties)—was not authorized by Plaintiff, and, in fact, Plaintiff specifically chose to decline to allow "Sale of Personal Data" via the CMP.

96.    Plaintiff had an objectively reasonable expectation of privacy surrounding his Private Communications on the Website based on Defendant's promise that users could deny cookies other than "Strictly Necessary Cookies", as well as state criminal and civil laws designed to protect individual privacy.

97.    Defendant's intentional intrusion into Plaintiff's and other Website users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that Website users could allow only "Strictly Necessary Cookies" when, in fact, Defendant caused such first party or third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers rejected all such non-essential cookies. Indeed, Plaintiff reasonably expected, based on Defendant's false representations, that when he rejected all non-essential cookies and tracking technologies, Defendant would not cause such first-party or third-party cookies to be stored on his device or permit the Third Parties to obtain his

- 31 -

Private Communications on the Website, including his browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data.

98.   Defendant's conduct was intentional and intruded on Plaintiff's Private Communications on the Website.

99.   Plaintiff has been damaged by Defendant's invasion of his privacy and is entitled to just compensation, including monetary damages. *See Rodriguez v. Google LLC*, No. 3:20-cv-04688-RS, Doc. 670 (N.D. Cal. Sept. 4, 2025) (awarding $425,651,947 in actual damages in class action following jury verdict finding liability for invasion of privacy and intrusion upon seclusion claims).

100.   Plaintiff seeks appropriate relief for that injury, including but not limited to, damages that will compensate him for the harm to his privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiff's privacy.

101.   Plaintiff seeks punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and made in conscious disregard of Plaintiff's rights and Plaintiff's rejection of the Website's use of cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

### FIFTH CLAIM FOR RELIEF

**California Invasion of Privacy Act**

**(Violation of Cal. Penal Code § 638.51)**

102.   Plaintiff incorporates by reference the foregoing paragraphs as if set forth hereinafter.

103.   CIPA includes the following statement of purpose:

"The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of

- 32 -

eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."

(Cal. Penal Code § 630.)

104. CIPA extends civil liability for various means of surveillance using technology, including the installation of a trap and trace device. Sections 638.50 and 638.51 of the California Penal Code are part of the CIPA.

105. California Penal Code § 638.51(a) provides that "a person may not install or use…a trap and trace device without first obtaining a court order.…"

106. A "trap and trace device" is "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

107. The Third Parties' (or other third parties') cookies and the corresponding software code installed by Defendant on its Website is each a "trap and trace device" because each "captures" "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiff's computer or device. (Cal. Penal Code § 638.50(c).)

108. At all relevant times, Defendant caused the Third Parties' (and other third parties') cookies and the corresponding software code—which are trap and trace devices—to be placed on browsers and devices, and/or to be used to transmit Plaintiff's IP address and user-agent information. *See Greenley v. Kochava*, 684 F. Supp. 3d 1024, 1050-51 (S.D. Cal. 2023); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 928-33 (N.D. Cal. 2024).

109. Some of the information collected by the Third Parties' (and other third parties') cookies and the corresponding software, including IP addresses and user-agent

information, does not constitute the content of Plaintiff's electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

110. Plaintiff did not provide his prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiff informed Defendant that he did not consent to the Website's use of third-party cookies by de-activating the "Sale of Personal Data" toggle switch in the CMP made available via the cookie consent banner.

111. Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiff's IP address and user-agent information.

112. As a direct and proximate result of Defendant's conduct, Plaintiff suffered losses and was damaged in an amount to be determined at trial.

113. Pursuant to Penal Code § 637.2(a)(1), Plaintiff is also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a)

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks judgment against Defendant as follows:

a. An award of compensatory damages, including statutory damages where available, to Plaintiff against Defendant for all damages sustained as a result of Defendant's wrongdoing including both pre- and post-judgment interest thereon;

b. An award of punitive damages;

c. An award of nominal damages;

d. An order for full restitution;

e. An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

f. An order permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

- 34 -

FIRST AMENDED COMPLAINT

g.  An order for declaratory relief;

h.  For reasonable attorneys' fees and costs as allowed by law; and

i.  For such further relief as may be just and proper.


Dated:  November 26, 2025                    PACIFIC TRIAL ATTORNEYS, APC


                                             By: */s/ Scott J. Ferrell*
                                             Scott J. Ferrell
                                             Attorneys for Plaintiff

- 35 -

FIRST AMENDED COMPLAINT

## CERTIFICATE OF SERVICE

I hereby certify that on November 26, 2025, I electronically filed the foregoing **FIRST AMENDED COMPLAINT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing via electronic mail to all counsel of record..

Dated:  November 26, 2025

*/s/ Scott J. Ferrell*
Scott J. Ferrell

- 36 -